DREW, J.
11 David Malcolm Hill (“Hill”) was convicted at bench trial of aggravated assault, a violation of La. R.S. 14:37. He was sentenced to pay a fine of $250.00 and court costs, or in default to serve 10 days in jail. The trial court delayed the execution of sentence pending the filing of a writ with this Court. Defendant, however, filed an appeal, which we converted to an application for supervisory review, granting certiorari, and docketing for disposition. We affirm.
I. OVERVIEW
On or about October 14, 2011,[1] Brandon Grant was driving home near the Trenton Street golf course in West Monroe, accompanied by his two children. He passed a group of people who were flagging him to stop. Believing someone needed assistance, Grant stopped and backed his vehicle to where the group was standing outside the home of David and Dana Hill, who were about to walk several children to a neighbor’s home.
Grant, believing he was a good Samaritan, put his window down and asked what was going on. Various members of the group responded that he had been speeding and should slow down in a residential neighborhood.
*619 What happened next is disputed. An argument, however, escalated, and the police were called. All agree that Hill moved toward Grant’s vehicle.
Hill claims he only reacted in self-defense. He admits having a gun, but denies that he pointed it at Grant.
12Grant stated that Hill pointed a gun at his head in front of his children, a version of events confirmed in part by another witness.
Hill at that time denied having a weapon on him, though he admitted that he had a gun in his vehicle. His wife, however, surreptitiously removed a gun from his pants pocket, and took it into their home.
Grant did have a pistol in his vehicle. The police removed it and returned it to Grant shortly thereafter. No arrests were made on that evening.
Three days later, Grant formally complained about how the officers handled the incident. Following interviews with witnesses, Hill and his wife were arrested.
II. TRIAL TESTIMONY 1. Brandon Grant testified that:
• late at night on October 14, 2011, he was driving toward his apartment complex with his children;
• he saw a group of people on the street who were flagging him down;
• he initially passed the group but backed up to see what was going on as he thought someone may need assistance;
• when he got to the group, the defendant’s wife told him to slow down;
• he denied speeding, at which point Hill intervened in the conversation;
• Hill began cursing him; Grant told him to stop; others in the group joined in;
«Mrs. Hill threatened to call the police, and may or may not have done so;
|s* when the police didn’t arrive, he tried to call the police, at which point Hill put a gun to his head, threatened to “blow his G*d d* *n” brains out;
• he was positive that the object pointed at him was, in fact, a gun;
• he tried to exit his vehicle, but Hill put his leg against the door;
• Hill moved away from the vehicle, and Grant called 9-1-1;[2]
• as he waited at the scene, he saw Hill trying to give the gun to others;
• the police arrived less than five minutes after his 9-1-1 call;
• he saw Hill give his gun to his wife;
• at the scene, after interviewing Hill, the police officer told Grant that it had only been a cell phone that Hill put to his head, not a gun;
• he acknowledged that he had a weapon[3] in his driver’s door, but he indicated he never reached for the weapon;
• he admitted speeding slightly — 32 miles per hour in a 25 mile per hour zone;
• he told Hill that he had a gun in his car only after Hill threatened him; and
• 13 police officers arrived on the scene following his 9-1-1 call.
2. Brandon Regan testified that:
• he and his family had supper at Hill’s house on the night of the incident;
• he and his son were tired so they left;
• after he had put his son to bed, a friend of his daughter’s arrived, asking him to come and help;
*620 • he heard Grant yelling to the defendant, “You’re not going to point a gun at my head, especially in front of my kids”;
j^* Grant repeated this statement several times, with curse words;
• Hill was standing near Grant’s vehicle telling him to calm down;
• Grant and his children exited his vehicle, and Grant called the police;
• Grant told his sons to watch Hill to make sure he didn’t do anything;
• he heard Hill ask someone to take the gun and put it in the house;
• he saw Mrs. Hill take something from Hill’s back pocket, and hide it on her;
• he did not see a gun that night;
• the police spoke with Hill and Grant that night;
• he did not give a statement until a couple of days later; and
• when he initially approached the group, he heard Grant yelling and Hill telling him to calm down;
3. Shelly Regan testified that:
• she and her family had dinner with Hill and his family;
• her husband left early to take their son home while she and her daughter and her daughter’s friend remained at the Hills’ residence;
• she saw Grant’s vehicle speeding down the street;
• Mrs. Hill moved closer to the street and flagged for the driver to slow down;
• the vehicle began to back toward them;
• the driver rolled down his window and asked what was going on;
• Hill told Grant that he had been going too fast;
• Grant responded that he thought something was wrong and stopped to help;
• an argument began between Hill and Grant;
. . she heard Grant threaten Hill,[4] and heard Hill respond;[5]
• she saw Hill reach into his back pocket, approach Grant’s vehicle, and then put his hands on the top of the car;
• she then heard Grant say, “[Yjou mean to tell me you’re going to pull a gun to my head in front of my kids”;
• Hill backed away from the vehicle and Grant exited;
• she asked Grant why he was getting out of the vehicle, to which he replied that he was going to call the police;
• she never saw Grant with a weapon that night;
• Hill initially told the police that he did not have a gun on him;
• the officer then talked to Grant and removed a gun from his vehicle;
• she heard Hill ask his wife to get rid of the gun;
• Mrs. Hill reached for something and acted as if she were talking on her phone while she walked into her house;
• Mrs. Hill told her that she had hidden the gun;
• she never saw a gun that night but she heard Hill say he was putting the gun in his front pocket for his wife to take it inside;
• she recognized Grant because he had purchased a used vehicle from her;
• she later gave a statement to the police detailing her account of the events;
• she was present while her daughter was questioned by the officers;
• her daughter told police that she saw the gun or a black object in Hill’s hand and he held the object to Grant’s head; and
*621 • she was frightened that evening and also in shock and embarrassed that the incident happened in her neighborhood.
|fi4. Detective Jennifer Smith of the West Monroe Police Department testified that:
• she became involved in the case on October 17, 2011, days after it occurred;
• Grant reported to the police department that day to express his displeasure as to how the department had responded to his 9-1-1 call;
• she spoke with the responding patrolman (Officer Allen), and concluded that the police department’s response to the incident was lacking;
• she assisted Officer Allen in re-interviewing the witnesses;
• after the interviews, she secured arrest warrants for Hill and his wife;[6]
• she asked Mrs. Hill to retrieve the pistol,
■ and she complied;
• Hill provided inconsistent statements as to his conduct;[7]
• Hill’s account of the events was significantly different from the statements of Grant and the Regans’ daughter, both of whom indicated that Hill held the gun to Grant’s head;
• the Regans’ daughter told her that she actually saw the weapon pressed against the victim’s skin;
• Hill had no concealed carry permit, even though he was an investigator with the Monroe Fire Department;
• no one saw Grant brandish his firearm, not even Hill;
• Mrs. Regan told her that Grant threatened to “blow somebody away”; and
17* the Regans’ daughter told her she had seen the indentation from the “black round object” on Grant’s head.
5. Dana Hill testified in substantial conformity with the other witnesses. She further testified that:
• she was with the group that saw Grant speeding;
• she saw Grant back up and ask what was up;
• Grant replied with a curse, at which point Mrs. Regan chastised Grant for cursing in front of the children;
• Grant responded with a threat to blast them all away;
• she got Grant’s license plate number and called the police;
• Grant threatened them several times;
• Mrs. Regan excitedly told her that Grant had a weapon;
• she saw her husband with his hands on the door, preventing Grant from exiting his vehicle;
• her husband usually carried a gun with him; and
• her husband later gave her the gun and she took it into the house.
6. David Malcolm Hill, the defendant, testified that:
• he worked as the chief arson investigator for the Monroe Fire Department and was a police officer with the Richwood Police Department;
*622 • his training convinced him that Grant was moving much faster than the speed limit;
• when Grant lowered his window to ask what was up, Hill told him to slow down, at which point Grant cursed him and the others several times;
• he saw Grant reach toward the console of his vehicle;
• accordingly, he moved to the car door and put his knee on the door;
• he reached for his weapon and held it in his hand as Grant continued to threaten him six or seven times;
Is*he was not the aggressor, as he was only protecting himself and the group;
• his wife and Mrs. Regan were standing at the back of Grant’s vehicle while Mrs. Regan’s daughter ran to get Regan;
• once the others were out of the way, he looked at Grant’s hands and saw he did not have a weapon, so he backed off;
• his wife told him the police were on the way;
• Grant got out of the car and threatened to fight him;
• he admitted trying to conceal the pistol with his wife;
• Grant stayed aggressive toward him and he kept telling him to calm down;
• he denied to the police that he put the gun to Grant’s head;
• he was at that time certified to carry a weapon;
• he could not retreat, because there were others to protect; and
• he was highly critical of the investigation by the West Monroe Police.
III. SUFFICIENCY, SELF-DEFENSE, AND APPLICABLE LAW
Hill complains that the trial court did not consider the threats made against him by Grant, which justified his actions as self-defense, a position he argues is buttressed by the subsequent discovery that Grant had a pistol in his vehicle. He urges that this record is insufficient in establishing guilt beyond a reasonable doubt.
The state responds that sufficient evidence was presented by which to justify the defendant’s conviction of aggravated assault and that there was no self-defense justification for his unlawful conduct.
Our law is clear regarding:
19* a sufficiency review,[8] and
*623 • the statutory definitions applicable to the crime of aggravated assault,[9]
|10* codal authority relative to the defense of justification[10] and self-defense.[11]
*624 IV. APPLICATION OF LAW TO FACTS
The state presented sufficient evidence to convict the defendant of the charged offense. To convict him, the state was required to show that Hill, while armed with a dangerous weapon, attempted to commit a battery or intentionally placed another person in reasonable apprehension of receiving 11,a battery. Aiming a pistol at a victim from point blank range and threatening to “blow his brains out” satisfies the level of proof required for conviction, if believed by the trial court. The victim testified to these exact facts, and the court believed him.
Other witnesses did not see Hill put the gun to the victim’s head; however, they indicated that the victim was extremely upset and continuously asked Hill why he held a gun to his head. There was testimony that one of the witnesses actually saw a black object being placed against the victim’s head. That witness was not certain that the object was a gun but it was black.[12]
Mrs. Hill admitted taking the firearm from her husband shortly after police arrived on the scene, behavior which seems inconsistent with innocence.
Hill changed his story about whether or not he had a gun, later admitting that he did hold a gun in his hand, but did not point it at the victim’s head.
One witness, considered by the trial court to be clearly unbiased, testified as to the imprint of a gun barrel on Grant’s forehead on the evening in question.
The testimony of Hill’s companions was inconsistent, except that not one witness saw Grant with a pistol, until it was removed from his car at the request of the police. Crucially, the moment he committed this crime, Hill had no knowledge that Grant even had a weapon in his vehicle.
112The trial court was able to observe the demeanor and motivations of the witnesses. It was in the best position by which to determine witness credibility.
The trial court found no overt or aggressive acts on the part of the victim that would justify the defendant’s resorting to using his weapon.
The trial court concluded that the defendant actually pointed the gun at the victim and that the force used was more than was necessary under these facts. Likewise, we find nothing here that justifies the violent actions taken by Hill.
The trial court correctly found the defendant guilty of aggravated assault.
DECREE
The defendant’s conviction and sentence are AFFIRMED.

. During testimony of many of the witnesses, the date of the incident is referenced as October 17, 2011. Detective Smith clarified that the correct date was October 14, 2011.

. Grant told 9-1-1, “I told them I'm going home and these people flagged me down. I stopped to help them and then he put a gun upside my head and I got my kids up in this car.”

. Grant testified that he had a permit to carry the gun.

. "I’ll blast you all out!”

. “No, no one’s going to blast anybody out.”

. Hill was arrested for aggravated assault; his wife was arrested for obstruction of justice.

. Hill first denied having a weapon, then admitted he had one but that it remained in his back pocket until he thought Grant was reaching for a weapon, at which point Hill took the gun into his hand. When he saw that Grant was only reaching for a cell phone, he put the weapon back in his pocket. He denied pointing the weapon at Grant's head, but admitted that it was near Grant’s head. He alleged that Grant had not been able to see the gun because he palmed it and held his hands against the top of Grant's vehicle.

. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the suf *623 ficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,-032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).

. Aggravated assault is an assault committed with a dangerous weapon. La. R.S. 14:37. Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery. La. R.S. 14:36. Battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33.

. La. R.S. 14:18, Justification; general provisions
The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances
(1) When the offender’s conduct is an apparently authorized and reasonable fulfillment of any duties of public office; or
(2) When the offender’s conduct is a reasonable accomplishment of an arrest which is lawful under the Code of Criminal Procedure; or
(3) When for any reason the offender’s conduct is authorized by law; or
(4) When the offender’s conduct is reasonable discipline of minors by their parents, tutors or teachers; or
(5) When the crime consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility; or
(6) When any crime, except murder, is committed through the compulsion of threats by another of death or great bodily harm, and the offender reasonably believes the person making the threats is present and would immediately carry out the threats if the crime were not committed; or
(7) When the offender’s conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.

.La. R.S. 14:19 Use of force or violence in defense
A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.
La. R.S. 14:21 Aggressor cannot claim self defense
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a *624 manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
La. R.S. 14:22 Defense of others It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect others.

. The gun confiscated later was black in color.