MOORE, J.
|,A jury found the defendant, Laravious Jackson, guilty as charged of armed robbery, a violation of La. R.S. 14:64. Jackson was sentenced to 12 years’ imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He now appeals his conviction, alleging the evidence was insufficient to convict. For the following reasons, we affirm the conviction and sentence.
FACTS
Laravious Jackson, the defendant herein, along with Brittany R. Moses and Floyd D. Agee, were charged with the armed robbery of Quincy Jones, a violation of La. R.S. 14:64. All three defendants initially pled “not guilty” to the charge. Subsequently, by individual plea agreements, Brittany and Floyd each pled guilty to simple robbery in exchange for specified sentences and each agreed to testify truthfully at the trial of Laravious Jackson as part of the plea agreement.
Brittany and Floyd testified at Jackson’s trial, as well as the victim, Quincy Jones. Each gave his (or her) version of the events leading to and. the commission of the-crime. Because there are inconsistencies in their respective accounts of the incident, the defendant contends by his sole assignment of error that the evidence was insufficient to sustain the conviction.
We begin with the testimony of the victim, Quincy Jones. Jones testified that, on the evening of the crime, Brittany Moses sent him a text message suggesting that they “hook up.” Jones explained that Brittany was an old friend and former coworker who on occasion danced and performed ^stripteases for him in exchange for cash. He testified that no actual sex was involved, and her request to “hook up” simply meant that she needed some cash. Jones said he told Brittany he could meet her that night, and she could spend the night at his house,[1] or, instead, they could meet at another time later. Jones said he needed to go to an ATM to withdraw cash.
Brittany arrived at Jones’s house located on Regent Street in the Ingleside neighborhood of Shreveport with her cousin, Floyd Agee, and another person called “Ray Ray.” Jones got in the back seat with Brittany, while Floyd drove. The front seat passenger was the defendant, Laravious Jackson. Brittany introduced him to Jones as “Ray Ray.”
Floyd drove to an ATM located at a Circle K near the Mansfield Road/Walker Road area where Jones withdrew $300 cash. Jones testified that he gave Brittany $75 and told her he would give her the other half of the money after the entertainment, “if it was to be some.”
He testified that Floyd and Jackson began demanding money for gas, and he gave them $10. He said that Floyd and Jackson complained that it was not enough money and continued to press for more money as they were ostensibly driving to Floyd’s mother’s house which backed up to a park. When they arrived at the park, both Floyd and the defendant got out of the car. Jones said he remained in the back seat of the vehicle “just playing ... *1153 in my zone.” After a few minutes, Brittany also got out of the car.
| sAfter 10 minutes, all three returned to their same places in the car. Floyd drove to the Mansfield or Walker Road area. Jones testified that Floyd and Ray Ray started up again about the gas money, and then accused him of being “smart mouthed.” When the ear came to a dark, secluded area, he testified that Ray Ray said, “That’s it. Pull over the car.” Jones said Floyd got out of the car, walked to the back of the car, opened the door, and hit him three times. Meanwhile, Ray Ray got out, walked around to Jones’s.side of the car, and pointed a silver gun at him. Jones said that the defendant said: “I’ll blow your brains out. I’ll kill you right here. You don’t know me. Keep talking. And you better give up the money.”
Jones said he gave Floyd the remaining $150 of the $300 he withdrew from the ATM. He said he had given Brittany $75 first, then another $75. He said that Brittany also gave her $150 to Floyd. Floyd then gave the money to the defendant to count it. He said Ray Ray counted .up the money which totaled $300.
Afterwards, they drove Jones back to his. neighborhood, dropping him off about 3 blocks from his house. According to Jones, before they dropped him off, the defendant threatened him by saying:
I’m going to kill you if you say anything. You better not call the police. I’m going to kill your mamma. I’m going to kill your girlfriend’s babies and all. I’m going to remember the red car in our yard and all that, and I’m going to shoot up your house.
After arriving at home, Jones waited a little while, and then walked to a nearby gas station to call the police.
^Following an investigation, Jackson, Brittany, and Floyd were all charged with armed robbery. Jackson filed pro se motions to suppress the conflicting statements of all three perpetrators and to quash the indictment on grounds that the state could not prove his guilt beyond a reasonable doubt due to their conflicting statements.
Jackson also filed a pro se “motion for identification” on grounds that the victim was unable to identify the defendant as the robber from the photograph lineup. He filed an additional pro se motion to suppress evidence on grounds that Brittany and Floyd gave false and conflicting statements to police without warrants for their arrest.
The court considered thq motions on the first day of trial. The trial court denied all of the pro se motions. Jackson’s attorney stated for the record that the defendant had declined the state’s plea offer of six years. The defendant confirmed his choice for the court and stated that he was ready for trial.[2]
Officer Jeffrey Bordelon and Detective John Jackson, of the Shreveport Police Department, investigated the armed robbery reported on the night of December 10, 2013. They interviewed the victim, Quincy Jones.
Bordelon testified that Quincy Jones told him that he made arrangements to pay for sex with Brittany. Brittany arrived at his house in a gold-colored, four-door, Camry and had two black males in the front. She was in the back seat. They drove to a Circle K convenience *1154 store, where | Jones withdrew $300 in cash from the ATM machine. Jones produced his receipt for the ATM machine, which was put into evidence, and which showed that he withdrew $300 from the machine. After driving to Day Street, Jones told Officer Bordelon that the driver got out of the car and struck him in the face several times. The front seat passenger exited the vehicle to stash some narcotics, and then pointed a silver handgun in Jones’s face and demanded money. The officer did not see any visible bruising on Jones’s face; and Jones declined'medical attention.
Brittany Moses testified that she had been friends with Jones since they had previously worked together. On December 9, 2013, she and Jones were texting each other, , and Jones asked her to come over, and he would give her $300. She indicated that Jones frequently gave her money, but she denied that she performed any services in return for the payments.
Once they had agreed to meet, Brittany called her cousin, Floyd Agee, to take her to Jones’s house. She also instructed Floyd to pick up Lavarious “Ray Ray” Jackson, the defendant herein. She said that she told Ray Ray of her plans, that is, that she was going to pick up some money from Jones, and that Ray Ray was cool with it — at first. They drove to Jones’s house on Regent Street, and then-took him to an ATM located at a Circle K on Walker Road. She testified that while Jones was inside the store getting money from the ATM, the defendant began talking about robbing Jones..'
After Jones returnéd to the vehicle and drove off, Brittany testified that the defendant tried to reach into Jones’s “hoodie” to get his money. When Jones pushed the defendant’s hand away, the defendant pulled out a |figun and pointed it at Jones.
According to Brittany, Floyd immediately stopped the car when the defendant pulled the: gun. Ray Ray then got out of the car, went around (the car), opened the back door, and pointed the gun at Jones’s face.
Brittany testified that Jones pushed the money at her. Then, she said the defendant was swinging at Jones, and the money was flying everywhere. . She said she tried to collect all the money and was counting it when the defendant snatched it from her hands. The defendant told Brittany to take Jones’s telephone because it contained the text messages from her. She took the phone, but gave it back to Jones because, she said, she felt sorry'for him. After robbing him, they dropped Jones off about a block from his house. Prior to dropping off Jones, she said that the defendant was “talking crazy,” but she said she could not remember what was said.
Brittany admitted that she initially lied to police about the robbery, telling Detective Jackson that á man known as “Cutthroat” committed the robbery. She said that the defendant was still her boyfriend at that time, and they (the defendant and Floyd) told her not to say anything. However, she eventually gave police the defendant’s name, and she identified the defendant as the robber in a photo lineup. She wrote and signed the back of the defendant’s photo stating that the person in the photo was the person who committed the robbery. This identification was put into .evidence.
Floyd Agee testified that on the evening before the crime, Brittany called him about obtaining some money in exchange for sex, or dancing. He indicated that Brittany’s involvement in such transactions occurred on a ^regular basis with both men and women. Floyd said that Brittany told him that she had a “trick” at 1:00 (a.m.), and he picked her up about 10:30 *1155 p.m., December 9,. He testified that they rode around waiting for “the dude to say he is ready.” Between 1:00 and 2:00 a.m., Brittany told Floyd to pick up her boyfriend, Lavarious. Floyd identified Lavarious as the defendant.
After they picked up Lavarious, he drove to Jones’s house to - pick him up. Floyd drove to the Circle K on Walker Road because he knew it was open all night. He testified that when Jones went inside the Circle K, the defendant began mumbling toward Brittany and calling Jones a “bitch.” Jones returned the vehicle and they pulled up to the gas station. Floyd pumped the gas while Jones went inside and paid $5 for gas.
Floyd testified that Jones gave Brittany $150 and said, “I am going to give you the rest after.” Following this statement, the defendant, who was posing as Brittany’s brother, asked what they were about to do. Jones said, “We fixing to chill.” The defendant said, “you chill with me and give me some money.” An argument ensued and the defendant pulled out a gun. Floyd pulled the car over. The defendant got out of the car, went around, and opened the back door. Floyd got out of the car and told Jones to get out of the car. When Jones did not move, Floyd punched him, and told him to “give me the money.” According to Floyd, Jones gave the defendant the money.
They all got back in the car. The defendant began talking about Jones telling on them and fussing at Brittany. Floyd testified that the defendant snatched the $150 she had from her hands. Next, the defendant wanted [8Jones’s cell phone. However, according to Floyd, Brittany hid the telephone. At that point, they arrived near Jones’s house. Jones got out of the ear and they drove off. He dropped off the defendant and Brittany at the Moonri-der Motel. • -
Floyd testified that when he first spoke with Detective Jackson, he told him “half of the truth.” He said he told him everything, but left himself out because he thought he could beat- it. He described the gun used by Ray Ray as a big, black gun. He said he probably hit Jones twice.
The state’s last witness'was Detective John Jackson of the Shreveport Police Robbery- Unit Jackson testified that he investigated the December 10, 2013, robbery and interviewed the individuals involved. He identified the defendant, Lara-vious Jackson, in open court as the person also called Ray Ray. .,
Jackson testified that Jones recounted the story of what' happened that night. He produced a receipt showing that Jones withdrew $300 from the ATM at a Circle K on Walker Road. Jackson went to the Circle K located at 8975 Walker Road and viewed a video that' showed the victim, Quincy Jones, enter the store at little before 3:00 a.m. and use the ATM. He left the store and got into a four-door gold Camry.-
Around January 3, Detective Jackson located Brittany Moses on Facebook registered under the name Brittany Agee. He went to her place of employment at Arby’s, and he requested that she come to the police station to speak with him. After she was advised of her rights under Miranda, Brittany admitted that she was in the vehicle when the robbery occurred. IsShe said the robber was a stocky, black male with dreads, named “Cutthroat.” She identified Floyd Agee as the driver, and said that Cutthroat was his friend whom she barely knew.
Detective Jackson brought in Floyd Agee for an interview. After he was advised his rights under Miranda, Floyd stated that Brittany’s boyfriend, Ray Ray, committed the robbery. He described him *1156 as a stocky, black male with dreads.' He described the events of that evening and said that he dropped off Brittany and Ray Ray at the Moonrider Inn on Monkhouse Road and Ray Ray gave him $20 for gas money.
Detective Jackson returned to the city jail to interview Brittany again. She admitted that Laravious Jackson (aka Ray Ray) had committed the robbery of Jones. Detective Jackson was able to obtain a photo of the defendant on the police database. Brittany’s description of the defendant matched the photo, so he created a six-person lineup using the file photo and pictures of similar individuals with similar age and physical descriptions. When he showed the lineup to Brittany, she immediately identified the photo of the defendant as Laravious Jackson, circled it, and then signed and dated it, stating that he was the individual who committed the robbery. This photo lineup was placed into evidence at trial.
Similarly, Det. Jackson showed Floyd Agee the same photo lineup. Floyd identified the same photo as Brittany as the individual who committed the robbery and also signed and dated it.
When Det. Jackson showed the same photo lineup to the victim, Quincy Jones, however, Jones was unable to identify anyone.
| mDetective Jackson also created a photo lineup containing a photo of Floyd Agee. Jones was able to identify the photo of Floyd as the driver of the gold Camry.
On January 21, 2014, Detective Jackson and other officers took the defendant into custody. Detective Jackson advised the defendant of his Miranda rights, and the defendant signed a waiver agreeing to speak with police. Det. Jackson testified that the defendant’s story initially matched the accounts of the victim, Floyd and Brittany. The defendant stated that a dispute arose in the car when Jones refused to give Floyd gas money. However, he said that, after leaving the Circle K, Floyd pulled the vehicle over, got out of the car, opened the back door, and argued with Jones. He did not see Floyd strike Jones. Afterward, Floyd got back in the car, drove on and dropped Jones off.
On cross-examination, Det. Jackson acknowledged that Jones stated that only Ray Ray got out of the vehicle, struck him, and robbed him at gun point. Det. Jackson alsó did not recall Jones telling him that Brittany got out of the car when they were at the park.
After closing arguments, the matter was submitted to the 12-person jury. The jury returned a verdict of guilty as charged of armed robbery by a vote of 10-2. The defendant entered an objection to the non-unanimous verdict.
Prior to sentencing, defense counsel filed motions for new trial and “post-judgment verdict of acquittal” [sic]. The trial court denied the motions and sentenced the defendant to 12 years at hard labor, without Inbenefit of probation, parole, or suspension of sentence. The sentence was imposed to run concurrently with the defendant’s prior remaining sentence of six years, and Jackson was given credit for time served.
This appeal followed.
DISCUSSION
In his sole assignment of error, Jackson alleges that the evidence was insufficient to support his conviction for armed robbery due to inconsistencies in the testimony of the three fact witnesses, Quincy Jones (the victim), Floyd Agee, and Brittany Moses.
Appellant contends that Brittany Moses was surely lying when she denied doing *1157 anything for the victim in exchange for $300. Her testimony was directly- contradicted by Jones, who testified that Brittany danced and stripteased for him. He also testified that he gave her $75 initially, and promised the rest of the money “after” she performed that service.
Appellant also argues that Floyd’s testimony was not consistent with his actions. He claimed that the robbery was not planned, but he admitted that he hit Jones to make him hand over the money.
Appellant also argues that both Brittany and Floyd received favorable plea bargains in exchange for their testimony against the defendant, implying that their credibility is questionable.. Additionally, the victim, Quincy Jones, could not identify the defendant in the photo lineup, nor did he identify him in court. Jones said he only saw the side of the defendant’s face. Appellant argues that if the defendant had truly done the things Jones said he did, such as pointing the gun in his face, he surely would have seen | iahis face. Furthermore, appellant implies that in Jones’s testimony, that he was “just playing ... .in -his zone” indicated he was on drugs at the time and could have been confused about the events of the evening and whether a robbery occurred.
Finally, appellant argues that because 2 of the 12 jurors did not find the defendant guilty of armed robbery, a rational fact finder would not have found him guilty beyond a reasonable doubt.
The state contends that despite some variations in the stories told by Jones, Brittany, and Floyd, all three corn sistently testified that Jackson pointed a gun at Jones and robbed him of his money. The testimony of Jones, Brittany, and Floyd was weighed by the jurors, who returned a guilty verdict. Where there is conflicting testimony about factual matters and resolution of the conflict depends on witness credibility, the conflicting testimony is considered for the weight of the evidence and not the sufficiency of the evidence, citing State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566 and 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
The state maintains that even though Jones was unable to identify Jackson from the lineup, both Brittany and Floyd identified Jackson as the person who robbed Jones while armed with a gun. Having heard the testimony of each witness, the jury made the factual determination that Jackson robbed Jones while armed with a gun. The state asserts that the variation in the witnesses.’ stories.does not render the evidence insufficient 11sto convict when all of the elements of the crime were presented to the jurors, who found the required elements for armed robbery were met.
 Turning to our review, the proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record,, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,149 (La.App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied, 2013-1798 (La.2/14/14), 132 So.3d *1158 410. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its . own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Crossley, supra; The appellate court does not, assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
114Pirect evidence provides proof of the existence of a fact. Testimony of a witness that he saw or heard something is ah example of direct evidence. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App. 2 Cir. 9/26/12), 106 So.3d 617.
■ When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra; State v. Robinson, 47,437 (La.App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied, 2012-2658 (La.5/17/13), 117 So.3d 918.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied, 2012-2667 (La.5/24/13), 116 So.3d 659; State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any [^witness in whole or in part; the reviewing court may impinge on'that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Woodard, 47,286 (La.App. 2 Cir. 10/3/12), 107 So.3d 70, writ denied, 2012-2371 (La.4/26/13), 112 So.3d 837; State v. Hill, supra.
An accomplice may testify against his co-perpetrator, and any inducements to testify go to the weight of the witness’s credibility, which is determined by the trier of fact in whole or in part. State v. Marshall, 44,121 (La.App. 2 Cir. 4/8/09), 6 So.3d 1051.
When the perpetrator’s identity is a key issue, the state must negate any reasonable probability of misidentification. State v. Hughes, 2005-0992 (La.11/29/06), 943 So.2d 1047; State v. Richie, 44,783 (La.App. 2 Cir. 10/28/09), 25 So.3d 879. A witness’s failure to identify the suspect at a pretrial lineup goes to the weight of that witness’s testimony and evidence may be introduced to explain any discrepancy. State v. Richie, supra. Positive identification by only one witness may be sufficient to support a defendant’s conviction. State *1159 v. Williams, 42,803 (La.App. 2 Cir. 12/5/07), 972 So.2d 1214.
We now apply these principles of appellate review for the sufficiency of evidence- for the armed robbery in this case. The Louisiana Legislature defines armed robbery in La. R.S. 14:64 as “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a hfidangerous weapon.” - Therefore, in order to obtain a conviction for the offense of armed robbery, the state must prove the following elements: (1) a taking (2) of anything of value (3) from a person or the immediate control of another (4) by the use of force or intimidation (5) while armed with a dangerous weapon. State v. Johnson, 48,407 (La. App 2 Cir. 8/07/13), 121 So.3d 1251, writ denied 13-2173 (La.3/14/14), 134 So.3d 1194.
After review, we- conclude that the evidence was sufficient to prove these elements. Jones stated that three individuals picked him up in a gold-colored sedan and drove him to a convenience store, where he withdrew $300 from an ATM. Jones gave a portion to the other backseat passenger as a pre-payment, and a portion to the driver as gas money, then kept the remainder. Then the driver and the" front passenger demanded the remainder of Jones’s money. When Jones refused, the driver punched him in the face multiple times. The front passenger then pointed a handgun with an extended clip at him and threatened to kill him if he did not give them the remainder of his money. Jones turned over thé monéy inf response to this threat.
Jones identified the1 other rear passenger as his Mend and former co-worker, ■Brittany Moses, who he regularly met with for entertainment. The victim identified the driver and the person, who punched him in the -face as Floyd, whom] 17Brittany introduced to him as her cousin. The victim also identified- Floyd from the photographic lineup as the driver and one of the robbers. - Finally, the victim said, it was the front passenger who pointed a gun at him, threatened his life, and took his mon.ey. He testified that Brittany introduced him as “Ray Ray.” Jones said this person wás the only one of the four who wore his hair in dreadlocks.
In their statements to police and at trial, the two eyewitnesses, Brittany and Floyd, confirmed these facts and the identity of Jackson as the front passenger and the one who threatened Jones with a gun and took his money. The jury was informed that these two witnesses were co-perpetrators who were allowed to plead guilty to a lesser charge with a reduced sentence in exchange for then- truthful testimony against Jackson.
The jury observed the witnesses during their testimony and were fully apprised of their participation in the offense and their plea bargain. Ten of the twelve jurors apparently found their testimony regarding the facts of the armed robbery to be credible and voted to convict. While the testimony of Jones, Brittany, and Floyd varied somewhat regarding mostly insignificant- details of the evening, their testimony regarding the facts of the armed robbery itself were consistent with their prior statements and with each other’s testimony.
The fact that Brittany denied that she engaged in sex acts or erotic dancing in exchange for money does not render, in our view, her entire testimony incredible. She was likely embarrassed over these circumstances. Nor do-we find that the -fact that Floyd hit the victim was inconsistent with his testimony that the armed robbery was not planned. The testimony *1160 established that Floyd became agitated and angry because he needed gas money which Jones was reluctant to give. Ultimately, the jury found the testimony of Brittany, Floyd and the victim credible.
| iRTheir testimony established that Jackson was the passenger in the front seat of the vehicle, and the person who threatened Jones with a gun and took Jones’s money from his person by the use of force and intimidation, while armed with a dangerous weapon. After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, this assignment is without merit.
CONCLUSION
For the reasons stated above, the defendant’s conviction and sentence ' are affirmed.
AFFIRMED.

. Jones said that Brittany was concerned that her aunt with whom she lived would lock her out of the house. Brittany testified that her aunt required that she be in the house by 10:00 p.m.

. Jackson made a counteroffer of two years' imprisonment and stated that if his offer was not accepted, he would stand trial.