Judgment rendered April 8, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,800-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ERIC D. GREEN                               Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 402,694

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPEALS AND                    Counsel for Appellant
WRIT SERVICE
By: Remy V. Starns
    Michael A. Mitchell
    Corrie R. Gallien


JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

KODIE K. SMITH
ERIC M. WHITEHEAD
Assistant District Attorneys

* * * * *

Before COX, THOMPSON, and ELLENDER, JJ.

**THOMPSON, J.**

An unarmed 17-year-old high school student walking home after school was lured to approach a vehicle when three assailants, motivated by rival gang membership, jumped out and shot him 19 times, killing him. In this proceeding, Eric Green, one of shooters, was convicted of second degree murder and sentenced to life imprisonment[1] for his involvement. Green now argues that there was insufficient evidence to convict him of this crime, that he was improperly prevented from confronting his accuser, and that his sentence is excessive. For the reasons that follow, we affirm his conviction and sentence.

### FACTS AND PROCEDURAL HISTORY

On January 27, 2022, 17-year-old D'Anthony Walker ("Walker"), was walking home from Booker T. Washington high school with his girlfriend, who then split off to go to her house, as Walker continued alone down Harvard Avenue in Shreveport, Louisiana. The two were not aware that they had been followed by a group of young men in what turned out to be a stolen 2021 Kia Soul. Inside the stolen vehicle were Marquise Starks ("Starks"), Antonio Bryant ("Bryant"), Marvin McDaniel ("McDaniel"), and the defendant, Eric Green ("Green"). The stolen Kia pulled alongside Walker, and when one of the dark-tinted windows cracked, Walker could hear a song playing that was associated with his gang. One of the members of the car displayed or "threw up" Walker's gang symbol, and he walked over to the car under the false impression the people in the vehicle were

_____

[1] Green's sentence is with the possibility of parole, due to his age at the time of the crime, as provided by *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

friendly to him. Having laid the trap, as Walker approached the vehicle Green, Starks, and Bryant jumped out and shot Walker, striking him 19 times and killing him. The assailants then fled the scene in the Kia. A few days later, when the stolen Kia was spotted by police and after a high-speed chase, McDaniel, Starks, and Bryant were apprehended and arrested for crimes associated with the murder of Walker. Green was also implicated and later arrested for second degree murder.

A five-day jury trial eventually commenced, with numerous witnesses and video of the shooting from a nearby home surveillance camera, and the following relevant testimony was adduced. The owner of the Kia, Alice Ragland, testified that she works the 5:00 a.m. shift at the Shopper Value on Hearne Avenue in Shreveport, Louisiana, and when she arrived at work on January 27, 2022, two young men approached her, and one of them brandished a gun. The assailant pushed her head down, putting her to the ground, and demanded her car keys at gunpoint. She testified she gave him the keys, and they drove away in the Kia, but that she could not identify the two young men who carjacked her.

Jason Saiz testified that he is an investigator with the violent crimes division of the Shreveport Police Department. He investigated the carjacking of Ragland's Kia and testified that the Kia was involved in a shooting later the same day it had been carjacked. Gerald Thomas testified that he is the supervisor of communications and custodian of records at the Shreveport Police Department. He identified the various 911 calls associated with the Harvard Street shooting as they were played for the jury. Elvira Hughes testified that she lives on Harvard Street, and her security cameras recorded the shooting. The footage was played for the jury. Earl

Bloomer is the assistant principal at Booker T. Washington High School, and he identified surveillance footage of the parking lot from the high school that captured Green leaving the school and the Kia following him shortly thereafter.

Shreveport Police Department Corporal Arthur Green testified that he is a patrol officer and that he responded to the call that a shooting had taken place on Harvard Avenue. When he arrived, he saw a black male covered in blood lying in the middle of the roadway and that there were people in the area screaming and crying. He secured the scene and noted that the fire department declared that Walker was dead when they arrived.

Jashonti Jackson testified that she was Walker's girlfriend, that they both attended Booker T. Washington High School and frequently walked home together from school. She identified herself and Walker on the surveillance video from the high school. That day she noticed a black Kia driving past them twice before she and Walker split up to walk to their own homes. Before she arrived home, she heard gunshots. She ran home, and then she and her father got in the car to find out what happened. She saw Walker lying in the street on his stomach and testified he was coughing up blood. She called 911, and that call was played for the jury.

Corporal Cody Walsworth testified that he is a member of the crime scene investigation unit of the Shreveport Police Department. He testified that he examined the scene of the shooting. He testified that he collected 26 9mm expended cartridge casings and three .357 caliber shell casings. He also examined the scene of the recovery of the stolen Kia. He testified that a .45 Glock was found at Green's mother's house, along with Ragland's

3

insurance card for the Kia. None of the ammunition from this .45 Glock matched the ammunition from the crime scene where Walker had been shot.

Officer Austin Page, formerly of the Shreveport Police Department, testified that he engaged in the police pursuit of the Kia. During that pursuit, he witnessed three people flee from the vehicle after a high-speed chase. He chased Starks, and the K-9 unit arrived to help locate the suspects. Starks, McDaniel, and Bryant were all located and arrested after the pursuit ended.

Dr. James Traylor testified that he is a forensic pathologist at Louisiana Health Sciences in Shreveport, Louisiana. He performed the autopsy on Walker and found that Walker died of multiple gunshot wounds. He noted that Walker sustained 19 gunshot wounds. Phillip Stout testified that he works for the firearms section of the Texas Department of Public Safety Crime Laboratory in Garland, Texas. Before that, he worked at the North Louisiana crime lab. He testified that he was provided with three 9mm firearms that were all located at Bryant's house. One of the 9mm pistols collected had fired 17 shell casing from the shooting site where Walker was killed.

Dr. Jessica Esparza testified that she is the DNA technical leader at the North Louisiana Crime Lab and that she was unable to match the DNA from the guns' triggers to Green. Corporal John Madjerick, who took photographs of Green after his arrest, testified that he was an investigator with the Crime Scene Investigation Unit at the Shreveport Police Department when the crime occurred.

Officer Delandro Washington testified that he works in the homicide division of the Shreveport Police Department, but at the time of the crime he worked in the patrol division. It was Washington who, a few days after the

4

shooting, spotted the stolen Kia and attempted to pull it over. The occupants of the Kia fled and a high-speed pursuit ensued. When the pursuit came to an end the occupants, later found to be Green, Starks, Bryant, and McDaniel, jumped out of the vehicle and fled. Sergeant Jeffrey Hammer testified that he works in the K-9 division of the Shreveport Police Department. His dog brought Bryant and McDaniel out from under different houses, and they were treated for dog bites. Officer Anthony Haines testified that he is a patrol officer with the Shreveport Police Department. His body camera footage shows Green being arrested.

McDaniel testified at the trial that he did not remember anything about the day of the shooting. However, prior to his testimony at trial, McDaniel had testified at a proffered testimony hearing.[2] He was cross-examined by counsel.

During that earlier hearing, he testified:

- He was picked up from a girl's house by the rest of the young men in the stolen Kia. They left the house to go get an acquaintance only identified by the nickname "Fat," with Green driving. After they picked up Fat, McDaniel drove the car and Green sat behind the driver's seat.

- He testified that as they were driving around, they saw Walker, whom he identified as a member of a rival gang. He did not know Walker personally but referred to him as an "op."

---

[2] Mekisha Smith Creal testified that she is the homicide screening chief with the Caddo Parish district attorney's office, and she certified and presented the recorded testimony from McDaniel at a previous hearing.

- McDaniel testified that Bryant called Walker over to the car, and when he got close, Green jumped out of the back and started firing his gun. Starks then started firing, and then Bryant. McDaniel identified that Green started firing first with a Glock 19. He testified that Bryant was firing a Glock .357 and Starks was firing a Glock 9 Smith & Wesson. McDaniel identified where Walker was in relation to the car when he was shot. After Walker collapsed, McDaniel and the other men drove off.

- McDaniel was shown the surveillance video in court, and identified each person in the video, including Green.

- McDaniel testified that Walker approached the vehicle because they were playing his gang song and Green threw up his gang sign. The windows were tinted so Walker could not see who exactly was in the car.

- McDaniel testified that they first saw Walker leaving the high school to walk home, as they were sitting in the parking lot of the school.

Even after reviewing his earlier testimony, McDaniel maintained that he remembered no details from the day of the shooting. He also claimed not to remember his prior testimony. A video of his earlier testimony was played for the jury.

Felicia Henry testified that she is the compliance coordinator with the Caddo Parish Sheriff's Office, and she certified a phone call made by Green at the jail in which he called McDaniel a "rat." Detective Torian Wesley testified that he works in the homicide division of the Shreveport Police Department and investigated Walker's homicide. He described how he obtained the Ring camera footage from a neighbor that depicts the murder,

6

which was played for the jury.  He also obtained security footage from the high school, which shows the Kia parked in the student parking lot and leaving to follow Walker and Jackson as they walk home from school.  He stated that the statement given by McDaniel was consistent with the video surveillance he collected.

Sergeant Jeremy Jordan testified that he manages the digital forensics unit at the Shreveport Police Department.  He used cellular location data to place Green near the site of the shooting at the time of the shooting.  Ashley Green testified that she is Green's mother but that he had not lived with her since 2017.

At the conclusion of the five-day trial, the jury unanimously returned a guilty verdict for second degree murder.  Green filed a motion for new trial and a motion for post-verdict judgment of acquittal, which were both denied.  Green was sentenced to life imprisonment, without the benefits of suspension of sentence or probation, but with the benefit of parole due to his age at the time of the crime.  This appeal followed.

## DISCUSSION

Green asserts four assignments of error, each of which will be addressed below.

**First Assignment of Error: There was insufficient evidence to convict Green of second degree murder.**

In his first assignment of error, Green contends that there was insufficient evidence to convict him of second degree murder.  The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Smith*, 47,983 (La. App. 2 Cir. 5/15/13), 116 So. 3d 884. *See also* La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L.Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

The Jackson standard is applicable in cases involving both direct and circumstantial evidence. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, and 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L.Ed. 2d 90 (2004). An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing it in the light most favorable to the prosecution. *Id.* When the direct evidence is thus viewed, the facts established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *Id.* Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Broome*, 49,004 (La. App. 2 Cir. 4/9/14), 136 So. 3d 979, *writ denied*, 14-0990 (La. 1/16/15), 157 So. 3d 1127. If a case rests essentially upon circumstantial evidence, that

8

evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Broome, supra.*

La. R.S. 14:30.1 provides, in pertinent part, that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent need not be proven as a fact and may be inferred from the defendant's actions and the circumstances of the transaction. *State v. Brown*, 03-0897 (La. 4/12/05), 907 So. 2d 1, *cert. denied*, 547 U.S. 1022, 126 S. Ct. 1569, 164 L. Ed. 2d 305 (2006). Deliberately pointing and firing a deadly weapon at close range are circumstances that will support a finding of specific intent to kill. *Id.* Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. *State v. Odums*, 50,969 (La. App. 2 Cir. 11/30/16), 210 So. 3d 850, *writ denied*, 17-0296 (La. 11/13/17), 229 So. 3d 924.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the State provided the essential elements of second degree murder. Walker was shot 19 times, and evidence presented at trial stated that 26 shell casings were found near his body. The record includes eyewitness testimony that Green was the first out of the Kia and the first to shoot Walker. Circumstantial evidence in the form of the surveillance videos and GPS tracking indicate that Green shot and killed Walker. Although McDaniel denied remembering the shooting at trial, the jury heard his detailed testimony during his proffer hearing of the description of the shooting. This

9

testimony was supported by the various surveillance videos. The jury had the opportunity to weigh this conflicting evidence and returned a guilty verdict. Where there is conflicting testimony about factual matters and resolution of the conflict depends on witness credibility, the conflicting testimony is considered for the weight of the evidence and not the sufficiency of the evidence. *State v. Jackson*, 50,400 (La. App. 2 Cir. 2/24/16), 189 So. 3d 1150. Considering the above, this assignment of error is without merit.

**Second Assignment of Error: The trial court erred in prohibiting Green from questioning McDaniel about the State's leverage over him.**

In his second assignment of error, Green contends that the trial court erred in prohibiting him from questioning McDaniel about the State's leverage over him. Green specifically argues that he was not allowed to cross-examine McDaniel about the benefit he was receiving from the State in exchange for his testimony. The record indicates otherwise.

The Confrontation Clause of the Sixth Amendment provides that, "[in] all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." This bedrock procedural guarantee applies to both federal and state prosecutions. *State v. Carper*, 45,178 (La. App. 2 Cir. 6/9/10), 41 So. 3d 605, *writ denied*, 10-1507 (La. 9/3/10), 44 So. 3d 708. The Sixth Amendment safeguards the defendant's right to confront his accusers and to subject their testimony to rigorous testing in an adversary proceeding before the trier of fact. *Id.*

The record reflects that McDaniel was questioned several times on the record about any potential benefit he was receiving from the State in exchange for his testimony. At trial, he testified:

Q:     Ok. Have I or anyone else promised you anything in exchange for your testimony?

A:     No, sir.

The State further questioned him regarding his appearance in an orange jumpsuit, and he explained that he was incarcerated for an unrelated shooting that occurred in 2024. Green directs this Court to his attempt to question McDaniel about his appearance in a prison jumpsuit during his proffered testimony hearing. The Court allowed Green's counsel to ask if McDaniel had ever been convicted of a crime but not testify about any pending charges he may have. However, the record reflects the following exchange that occurred between Green's counsel and McDaniel at this hearing:

Q: Has she given you any offers or said if you testify, it will help your case or we will plead you to a lesser charge down the road?

A: No, sir.

Q: She hasn't given you any plea offers?

A: No, sir.

Q: Okay. What is your expectation of what you can receive as a result of this testimony?

A: I don't know. I don't know.

Q: Do you expect to get a plea offer or a deal?

A: No, sir.

Q: At all? You're doing this out of the goodness of your heart?

A: Yes, sir.

After reviewing the entirety of McDaniel's testimony, both at trial and at the proffered testimony hearing, it is apparent that Green had the opportunity to confront his accuser. McDaniel was repeatedly questioned about any

11

potential benefit provided to him from the State in exchange for his testimony. Green's counsel had the opportunity to cross-examine McDaniel and did in fact do so during both of his testimonies. We find this assignment of error is without merit.

**Third Assignment of Error: The trial court abused its discretion in imposing an excessive and unsupported sentence because there was no pre-sentence investigation and the trial court did not list any Article 894.1 factors.**

**Fourth Assignment of Error: The trial court imposed an unconstitutionally excessive sentence.**

Both the third and fourth assignments of error address the excessiveness of Green's sentence, and as such, we will consider them together. Green argues that his sentence is excessive because the trial court did not consider any mitigating factors and no presentence investigation was ordered by the court. He further argues that he should have been sentenced to a lesser sentence because of his youth, lack of criminal record, and propensity for change.

The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). La. R.S. 15:574.4(F) states that any person serving a sentence of life imprisonment for a conviction of second degree murder who was under the age of 18 years at the time of the commission of the offense, shall be eligible for parole if certain conditions have been met. Green was sentenced to the mandatory minimum of life imprisonment at hard labor, *with* the benefit of parole.

Ordinarily, appellate review of sentences for excessiveness is a two-step process, the first being an analysis of the district court's compliance

12

with the sentencing guidelines of La. C. Cr. P. art. 894.1 and the second being an analysis of the sentence for constitutional excessiveness. *State v. Smith*, 53,827 (La. App. 2 Cir. 3/3/21), 315 So. 3d 407. Here, the record reflects that Green timely filed a motion to reconsider sentence, which the trial court denied. However, in the motion, he asserts only that his sentence is excessive. Green did not object to the failure to adequately articulate reasons for sentence under La. C. Cr. P. art. 894.1. Pursuant to La. C. Cr. P. art. 881.1, the failure to include a specific ground upon which a motion to reconsider sentence may be based precludes Green from raising the ground for relief on appeal. *State v. Mims*, 619 So. 2d 1059 (La. 1993).

Moreover, where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. *State v. Ivory*, 54,886 (La. App. 2 Cir. 1/11/23), 355 So. 3d 1157, *writ denied*, 23-00275 (La. 1/10/24), 376 So. 3d 132. As such, Green's claim of sentencing error is limited to the issue of constitutional excessiveness.

Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense, or shocking to the sense of justice. *State v. Lobato*, 603 So. 2d 739 (La. 1992); *State v. Davis*, 50,149 (La. App. 2 Cir. 11/18/15), 181 So. 3d 200; *State v. Scott*, 50,920 (La. App. 2 Cir. 11/16/16), 209 So. 3d 248, *writ denied*, 17-0353 (La. 11/13/17), 229 So. 3d 478. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Davis*, 52,453 (La. App. 2 Cir. 2/27/19), 265 So. 3d 1194. A sentence is considered grossly

disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596.

The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of his discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Diaz*, 46,750 (La. App. 2 Cir. 12/14/11), 81 So. 3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Williams*, *supra*; *State v. Free*, 46,894 (La. App. 2 Cir. 1/25/12), 86 So. 3d 29.

Louisiana appellate courts have repeatedly rejected the argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution. *State v. Ivory*, *supra*. To rebut the presumption that the mandatory sentence is constitutional, a defendant must clearly and convincingly show that he is exceptional, which means that because of unusual circumstances, he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. *State v. Ivory*, *supra*.

Here, we find no justification for a downward departure from the mandatory minimum sentence. The record reflects that this was a cold-blooded killing of a young man who had been followed and lured to his death by Green and his friends. Green has already received the benefit of the potential for parole. While we acknowledge his age at the time this

14

crime was committed, there is nothing in the record that indicates a downward departure is warranted or necessary. For these reasons, this assignment of error is without merit.

## ERROR PATENT

Our review of the record reveals that the trial court did not comply with the obligatory delay before sentencing Green. La. C. Cr. P. art. 873 requires that "[i]f a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." Green was sentenced on the same date that his motion for a new trial was denied. Nevertheless, we conclude that any error was harmless in this instance because Green did not object to the trial court's failure to observe the sentencing delay and because he suffered no prejudice as he faced a mandatory sentence of life imprisonment. *State v. Jones*, 56,042 (La. App. 2 Cir. 12/18/24), 403 So. 3d 659, *writ denied*, 25-0002 (La. 2/25/25), 401 So. 3d 665.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Eric Green are affirmed.

AFFIRMED.

15