Judgment rendered September 25, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 992,
La. C. Cr. P.

No. 52,742-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ARIJORAY LAVON COPELAND                     Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 16F2498

Honorable Clarence Wendell Manning, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Meghan Harwell Bitoun

ARIJORAY LAVON COPELAND              Pro Se

ROBERT STEPHEN TEW                   Counsel for Appellee
District Attorney

HOLLY A. CHAMBERS-JONES
MICHELLE ANDERSON THOMPSON
Assistant District Attorneys

* * * * *

Before GARRETT, STONE, and COX, JJ.

**STONE, J.**

This criminal appeal arises from the Fourth Judicial District Court, Ouachita Parish, the Honorable C. Wendell Manning presiding. The defendant, Arijoray Lavon Copeland ("Copeland"), was charged with armed robbery and illegal possession of a stolen firearm. Following a jury trial, Copeland was found guilty and sentenced to 40 years at hard labor, without benefits, for armed robbery, and 5 years at hard labor, without benefits, for illegal possession of a stolen firearm, to be served concurrently. On February 8, 2018, Copeland filed a motion to reconsider sentence, which the trial court denied on the same day. Copeland now appeals his convictions and sentences. For the following reasons, Copeland's convictions and sentences are affirmed.

## FACTS

Copeland was charged by bill of information on November 15, 2016, with one count of armed robbery and one count of illegal possession of a stolen firearm. On January 5, 2017, Copeland waived formal arraignment and entered a not guilty plea. Jury selection began on October 23, 2017, and concluded on October 24, 2017. After the conclusion of jury selection, the trial began with opening statements. The state then presented its case-in-chief, and called West Monroe Police ("WMP") Detective Paul Blunschi ("Detective Blunschi") as its first witness.

Detective Blunschi testified that he was the on-call detective on September 15, 2016. Detective Blunschi received a call regarding an armed robbery at Motel 6 in West Monroe shortly after 5:00 that morning. Detective Blunschi arrived on the scene, spoke with the victim, Kushana Walton ("Ms. Walton"), and watched a copy of the video surveillance that

captured the robbery. Detective Blunschi testified that he made a copy of the video, which was later identified and played in court.

The state called Ms. Walton as its next witness. Ms. Walton testified that on September 15, 2016, she was working at Motel 6 at 401 Constitution Drive, in West Monroe, Louisiana. She arrived at work a little after midnight and at approximately 5:00 a.m., as she was sitting at the front counter, she saw someone enter the motel from the left of the front door, holding a gun. The man rushed in, jumped over the counter, while pointing the gun at her, and demanded she open the cash drawer.

Ms. Walton testified that she pushed her chair away from the front counter, falling to the floor. She described the perpetrator as a black male dressed in all black with a youthful build, a couple of inches taller than her 5'5" frame. Ms. Walton testified that the robber had on black pants, a black hoodie pulled over his head, a black mask/hat on underneath the hoodie with some type of black and white skull pattern, and black and white striped gloves. Ms. Walton stated that the gun was grey and black, and identified the gun used during the robbery as Exhibit S-5. The robber initially placed the gun at Ms. Walton's side, but after she fell to the floor, it was then placed to her head. The robber removed the cash drawer containing $357 and exited the motel.

During trial, Ms. Walton also identified photos of the cash drawer removed during the robbery. Trial continued on October 25, 2017 however, prior to the jury being brought back inside the courtroom, and at the request of defense counsel, the state's previous plea offers to Copeland were placed on the record, which Copeland thereby confirmed that he was rejecting. Counsel for Copeland also put on the record that Copeland had just recently

2

provided exculpatory information to him that he (Copeland) was not the only suspect for this armed robbery. However, Copeland refused to provide his counsel with additional information, such as who the other suspect(s) were.[1]

The jury was brought into the courtroom and the state continued with its case-in-chief and called its next witness, David Drumwright ("Mr. Drumwright"). Mr. Drumwright testified that on September 15, 2016, he was in Monroe, Louisiana, for work and stayed at the Quality Inn, in West Monroe near I-20 and Downing Pines Industrial Park. Mr. Drumwright testified that on the morning of September 15, 2016, he got up shortly after 5:00 a.m. to go running. He then left the Quality Inn, began running behind the LaQuinta Inn & Suites on a gravel path, heading west toward Restoration Park. To illustrate the area where he was running, the state introduced and offered a Google map of the park.

Mr. Drumwright testified that during his run he encountered a black male and described him as a couple of inches taller than himself, having an athletic, but not large build, wearing a dark hoodie and dark pants. Mr. Drumwright testified that he is between 5'8½"- 5"9' and that his reference to a couple of inches is between two and three inches. About 30 seconds later, as he continued to run down Constitution Drive, he was stopped by a police officer. Mr. Drumwright explained to the officer that he was running down the designated running trail, but it was not stable, so he was trying to get back to a well-lit area. He further stated that he saw someone as he was running, but other than that did not see anything unusual. The conversation with the police officer lasted less than a minute, around 45 seconds. Mr.

---

[1] A more detailed discussion regarding defense counsel's entries onto the record are discussed in defendant's Assignment of Error No. One.

Drumwright then returned to his hotel room, dressed, checked out, and, as he was leaving the hotel, dropped off his business card with officers, who were still at Restoration Park.

The state called WMP Officer Ryan May ("Officer May") as its next witness. Officer May testified he has been employed with the WMP for about 3 years. Officer May testified that he was on duty on September 15, 2016, and at approximately 5:03 a.m., he was dispatched to Motel 6. Officer May testified that as he was traveling east on Constitution Drive, he saw a white male jogger near Restoration Park. Officer May made contact with the jogger, and after his conversation, which lasted between 30 and 45 seconds, he went to the parking lot of Restoration Park and observed a white Ford Expedition. Officer May stated that there was no one near the vehicle, at least one window was partially down about 2 to 3 inches, and all doors were closed. Officer May inspected the vehicle and observed that it was still warm and that there was a Louisiana ID or driver's license in the cup holder or middle console. Officer May stated he remained with the vehicle until Corporal Yarbrough and Officer Henson arrived and took possession of the vehicle. Officer May stated that he unsuccessfully attempted to get video footage from two other businesses and walked through Restoration Park, but found no evidence connected to the robbery.

The state then recalled Detective Blunschi, who testified that while he was at Motel 6, he received a call informing him that a white Ford Expedition had been located in Restoration Park. After speaking with Ms. Walton, watching video footage from Motel 6, and taking photos of the interior and exterior, which were later identified by Detective Blunschi, offered and introduced into evidence, and published to the jury, he left Motel

4

6 and headed to the location of the vehicle. He testified that the vehicle was located approximately 200 to 300 yards from Motel 6 and when he arrived at Restoration Park, he observed officers with a white Ford Expedition. The vehicle had either 1 or 2 windows cracked about 2 inches. Detective Blunschi testified that as he could see into the vehicle, he noticed a driver's license in the front console/cup holder area, but he was unable to read the name. Detective Blunschi testified that he was also able to see into the back seat and photographed a camouflage mask and some black and white gloves which matched what he observed in the Motel 6 surveillance video.

After he took the photographs, the vehicle was seized and towed to the crime scene bay at the West Monroe Police Department. Detective Blunschi testified that once the vehicle was towed, he made contact with Arijoray Copeland, the person whose driver's license[2] he had previously observed in the vehicle.[3] Detective Blunschi further testified that he received written consent to search the vehicle, Copeland was present during the search, and Copeland did not terminate the search at any time. Once the vehicle was open, Detective Blunschi observed a camouflage mask/hat combination and black and white striped gloves on the back seat which were shown to the jury. Under the backseat, Detective Blunschi testified that a cash tray full of money totaling $337.86 and a semi-automatic pistol were also found.

Detective Blunschi also confirmed that the semi-automatic pistol found during the vehicle search was the same firearm recovered from the

---

[2] The name on the identification card was identified by another officer, who did not testify and was not identified during the trial.

[3] The white Ford Expedition was registered to Copeland's father, Anthony Rogers.

5

vehicle and was loaded with live ammunition. The serial number was obtained from the grip, which was also photographed and entered into the NCIC database to determine if it was stolen. Detective Blunschi testified that the NCIC report confirmed that the firearm was stolen out of Ouachita Parish and provided the information for Ouachita Parish Sheriff's Office Investigator Lamar Cole ("Detective Cole"), the officer assigned to the stolen firearm investigation. Copeland was arrested and a more thorough inventory search was done the following day, pursuant to a search warrant.

In the middle of Detective Blunschi's testimony, the jury was excused from the courtroom. The court, with both the state and defense counsel present, discussed other crimes evidence related to the burglary that involved the stolen firearm. Defense counsel stipulated to law enforcement testifying about the burglary investigation at 161 Cowboy Lane, Calhoun, which resulted in Copeland's charge of illegal possession of stolen things (including the firearm used in the instant offense) in another docket number, for purposes of guilty knowledge, identity, and absence of mistake or fact.[4]

Detective Blunschi resumed testimony by identifying additional photos of the white Ford Expedition after it was towed to the evidence bay to be searched. During that second search, which was pursuant to the search warrant, several additional items were recovered and photographed, which included a cell phone, a camo backpack, and a hoodie which matched the one worn by the robber as seen in the Motel 6 video surveillance. The hoodie, hat/mask, glove recovered from the vehicle; along with swabs from the firearm and magazine, reference swabs of Copeland and MiShon Cage

---

[4] A more detailed discussion regarding defense counsel's stipulation is discussed in defendant's Assignment of Error No. One.

("Cage"), another suspect, were all sent to the North Louisiana Crime Lab for DNA testing.

Two cell phones were located in the vehicle, however only one was working. Detective Blunschi testified that he retrieved the phone number of the working cell phone from 911, and used that information to obtain a search warrant to get information on the phone's movement from the service provider. Detective Blunschi testified that the information provided by AT&T indicated that between 1:24 a.m. and 4:24 a.m. the phone traveled from Copeland's home in Calhoun in an eastward direction to Commercial Parkway, where Motel 6 is located.[5]

The state's next witness was Kari Shiffman Dicken ("Ms. Dicken"), a forensic DNA analyst at the North Louisiana Crime Lab. Ms. Dicken testified that she is responsible for examining evidence, extracting DNA, getting profiles from the items tested, writing reports based on the evidence examined, and then testifying in court as to her report. Ms. Dicken testified that she received the following evidence to examine: A Nike sweatshirt, hat/mask, and gloves, all recovered from the white Ford Expedition, along with swabs from the firearm magazine and reference swabs of Copeland and Cage. Ms. Dicken testified that a "single source DNA profile" match to Copeland was found on the mask and one of the gloves. Ms. Dicken also testified that on the hoodie and other glove, Copeland's DNA profile was present and 98.7% of the rest of the population was excluded as possible donors of the DNA, including Cage.

---

[5] A more detailed discussion regarding the movement of the cell phone is discussed in defendant's Assignment of Error No. Two.

The state's final witness was Detective Cole.  Detective Cole investigates property crimes and theft, and was involved in the investigation of the burglary at 161 Cowboy Lane, Calhoun.  As previously mentioned, he became involved with the armed robbery at Motel 6 when Detective Blunschi contacted him regarding a firearm that was located in the course of the investigation.  Detective Cole identified the firearm as a match to the firearm stolen from 161 Cowboy Lane, Calhoun.  Detective Cole stated that once Detective Blunschi contacted him, he came to the crime scene bay at the West Monroe Police Department where the vehicle was located and looked at the recovered items to see if there was anything else from the Cowboy Lane burglary in the vehicle.

Detective Cole testified that he also identified a camo Camelbak brand backpack as a stolen item.  Detective Cole stated that he then got a search warrant for Copeland's residence and found additional items that were stolen from 161 Cowboy Lane, Calhoun.  Several hundred Pokémon playing cards, a camo duffel bag with the name "Nick" on it, and a cardboard box with several .22 rounds that matched the previously recovered firearm were located at his residence.  Detective Cole stated that once they were provided Copeland's name, he was able to search a database to determine if Copeland had pawned any items stolen from 161 Cowboy Lane, Calhoun.  A Nintendo DS system and a Pokémon game had been sold to GameStop in West Monroe.

Following Detective Cole's testimony, the state rested and the jurors were excused until the next day.  The following day, on October 26, 2017, the trial court reconvened outside the presence of the jury, with all parties present to discuss the jury instructions.  The parties agreed upon the

instructions to be presented to the jury.[6]  When the jury was brought back into court, the state rested and the defense rested, indicating that no witnesses would be called and that Copeland did not intend to testify.  The evidence, with the exception of the firearm, was published for the jury to review and inspect, while in the courtroom.

After the jury looked at the evidence, court resumed and closing statements were given by the state and defense, with the state giving a rebuttal to the defense's closing.  The court then read the agreed upon jury instructions to the jury and the jurors were excused to deliberate.  The jury reached a verdict, finding Copeland guilty as charged of armed robbery and illegal possession of a stolen firearm.  Copeland's matter was set for sentencing and a presentence investigation report was ordered by the trial court.

On February 7, 2018, Copeland was sentenced to 40 years at hard labor without benefits for armed robbery and 5 years at hard labor without benefits for illegal possession of a stolen firearm, with both sentences to run concurrently.  Following sentencing, counsel for Copeland gave oral notice of his intent to file a motion to reconsider sentence and motion for appeal.  On February 8, 2018, counsel for Copeland filed a motion to reconsider sentence, which was denied the same day.  In addition, on February 8, 2018, counsel for Copeland filed a motion for appeal which was granted, and this appeal ensued.

## DISCUSSION

*Evidence Insufficient to Convict Defendant of Armed Robbery*

---

[6] A more detailed discussion regarding the agreed upon jury instructions is discussed in defendant's Assignment of Error No. One.

On appeal, Copeland argues ineffective assistance of counsel and sufficiency of evidence as it relates to both of his convictions and improper jury instruction. Because defendant's second and third assignments of error challenge his convictions rather than his sentences, they will be addressed first.

Copeland argues that in the instant case, no jury could have found beyond a reasonable doubt he committed armed robbery. He maintains that there is no evidence that he was at or near Motel 6 on September 15, 2016. Argument by Copeland states that two people encountered the armed robber: Ms. Walton and Mr. Drumwright, neither of whom was able to identify him as the robber. Ms. Walton described the robber as 5'6" tall, whereas Mr. Drumwright described the person he encountered as 6' tall. Copeland is 5'9" and argues the he does not fit either description.

Copeland further argues that the white Ford Expedition that was found near Motel 6 which had his driver's license and clothing inside, the clothing had appeared to match the clothing seen on the Motel 6 video surveillance, had both Copeland and Cage's DNA on them. Copeland argues that the evidence presented to the jury was insufficient to show beyond a reasonable doubt that he committed the armed robbery. Copeland cites *State v. Williams*, 423 So. 2d 1048 (La. 1982), which held that circumstantial evidence in a Louisiana criminal conviction is held to a higher standard. La. R.S. 15:438 provides, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

Copeland argues that the state's evidence does not exclude every reasonable hypothesis of innocence. Copeland alleges there were multiple

10

persons associated with the white Ford Expedition that contained the stolen items. He further alleges that the state attempted to exclude other possible perpetrators, by sending the DNA of Cage to be tested against the evidence. Copeland interprets the DNA evidence to say that Cage could not be excluded as a contributor of DNA on some of the clothing and further argues that the state failed to put forth evidence of Cage's age or height, to exclude him as a suspect.

The state responds that Copeland's argument is without merit because the witness testimony and evidence presented created a sufficient basis for a reasonable jury to find him guilty. Ms. Walton testified that the robber came from a westerly direction (the left) before entering the motel lobby at approximately 5:00 a.m. Ms. Walton testified that the robber was wearing all black, black and white gloves, a black mask with a pattern on it that covered his face with a hoodie over his head. Ms. Walton testified the robber pointed a gun at her during the robbery and exited the motel headed in a westerly (to the left) direction. Additionally, the state argues that based on the physical appearance and voice of the robber, Ms. Walton testified the robber was a young African-American male with a young body frame that was a bit taller than her 5'4" or 5'5" height.

The state contends that Ms. Walton made this assessment regarding the robber's height, although she did not have an opportunity to stand next to him as she was on the ground during most of the robbery. The state highlights that there was no testimony regarding Copeland's height presented during trial. The state argues that the jury watched the video of the armed robbery numerous times and was able to compare the build,

stature, and height of the robber to that of Copeland, who was present in the courtroom throughout the proceedings standing, sitting, and moving.

The state further argues that Restoration Park is approximately 200 to 300 yards west of Motel 6 and at approximately 5:10 or 5:15 a.m., Mr. Drumwright encountered a young man as he was running through the parking lot. Mr. Drumwright described the young man as a young black male not large, athletic build, and not tall, wearing black pants and a black hoodie, standing outside an open door of a white Ford Expedition.

Mr. Drumwright testified that although it was dark, the parking lot was well lit. Within 30 seconds of seeing the young male, Mr. Drumwright encountered Officer Ryan May, who went directly to the white Ford Expedition.

Officer May testified that the hood of the vehicle was still warm and that he saw through the windows a hat/mask, gloves on the back seat, and an identification card in the front console cup holder. Once the vehicle was searched, a hoodie, which matched that worn by the robber, and cell phone were also recovered. The hoodie, hat/mask, and gloves were sent for DNA analysis. Ms. Dicken testified that a "single source DNA profile" match was found on the mask and one of the gloves. Ms. Dicken also testified that on the hoodie and other glove, Copeland's DNA profile was present and 98.7% of the rest of the population was excluded as possible donors of the DNA, **including Cage**.

Additionally, the state argues that the cell phone data from the working cell phone found in the white Ford Expedition places Copeland traveling shortly before the robbery at approximately 4:26 a.m. in a vehicle from his home in Calhoun to Restoration Park. The state argues that the

12

witness description, the clothing, the DNA results, and the data from the cell phone was sufficient evidence of Copeland's guilt beyond a reasonable doubt.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Robinson,* 51,830 (La. App. 2 Cir. 2/28/18), 246 So. 3d 725, *writ denied,* 18-0573 (La. 2/11/19), 263 So. 3d 897. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with *Jackson v. Virginia*, *infra*, in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Moton*, 46,607 (La. App. 2 Cir. 9/21/11), 73 So. 3d 503, 508; *State v. Bosley*, 29,253 (La. App. 2 Cir. 4/2/97), 691 So. 2d 347, *writ denied*, 97–1203 (La. 10/17/97), 701 So. 2d 1333.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*; State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not

provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Robinson*, *supra*.

A reviewing court affords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Mitchell*, 50,188 (La. App. 2 Cir. 11/18/15), 181 So. 3d 800, *writ denied*, 15-2356 (La. 1/9/17), 214 So. 3d 863; *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913, *cert. denied*, 561 U.S. 1013, 130 S. Ct. 3472, 177 L. Ed. 2d 1068 (2010). La. R.S. 14:64 provides, in pertinent part, that "[a]rmed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. *See* La. R.S. 15:438; *State v. Robinson*, 47,437 (La. App. 2 Cir. 11/14/12), 106 So. 3d 1028, *writ denied*, 12-2658 (La. 5/17/13), 117 So. 3d 918.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. *State v. Henry*, 47,323 (La. App. 2 Cir. 7/25/12),

103 So. 3d 424, *writ denied*, 12–1917 (La. 3/8/13), 109 So. 3d 356; *State v. Hill*, 47,568 (La. App. 2 Cir. 9/26/12), 106 So. 3d 617. The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *Id.*

In reviewing a conviction based on circumstantial evidence, the court must determine that, viewing the evidence in light most favorable to the prosecution, a rational trier of fact could have concluded beyond reasonable doubt that every reasonable hypothesis of innocence had been excluded; not every hypothesis of innocence need be excluded, but only those which are reasonable. *State v. Sims*, 426 So. 2d 148, 151 (La.1983).

In this case, a review of the record reveals that there was sufficient circumstantial evidence to support a jury finding Copeland guilty of armed robbery beyond a reasonable doubt. The jury, as fact finder, weighed the credibility of the state's witnesses and the verdict suggests that they found them credible. The determination of weight and credibility by the fact finder is given great deference and is not reassessed on review. There is no doubt that the white Ford Expedition located in the parking lot was associated with the robbery in question, as the cash drawer with the exact amount of money that was stolen was located in the vehicle. Additionally, clothing which matched that worn by the robber, a cell phone that tracked Copeland's movement from his home to the area of Motel 6, and a gun matching the one used in the robbery were also found. The jury was able to watch the video of the robbery and compare physical features of the robber to those of Copeland, who was present in the courtroom. After watching the video of

15

the robbery, the jury was able to compare the items found in the white Ford Expedition: hat/mask, gloves, and hoodie, with those worn by the robber in the video.

The jury also heard testimony of Ms. Dicken, who completed a forensic DNA analysis at the North Louisiana Crime Lab as to the DNA findings of the hat/mask, gloves, and hoodie. Ms. Dicken testified that the sweatshirt's "DNA profile from that major contributor was consistent with the reference sample from Arijoray Copeland… And the probability of finding the same DNA if it had come from a different person other than Arijoray Copeland for that major contributor, was approximately 26.1 in 26.2 quadrillion."

Ms. Dicken testified that the DNA profile from the camo hat/mask "was consistent with the DNA profile that came from the reference sample of Arijoray Copeland and a probability of finding the same DNA profile as an unknown unrelated individual as Arijoray Copeland was approximately 1 in 327 million." Ms. Dicken testified that the gloves' DNA profile was consistent with the DNA profile from Arijoray Copeland, and the probability of finding the same DNA if it had come from another unknown, unrelated individual was **26.2 quadrillion**. Ms. Dicken testified that the other glove's DNA profile was consistent with being a mixture of at least two individuals and that Copeland could not be excluded as a possible contributor to the mixture.

The jury also heard testimony from Detective Blunschi. Detective Blunschi testified to the movement of the cell phone found in the white Ford Expedition. Detective Blunschi testified that he received data from AT&T that allowed him to determine the location of the phone in the hours leading

16

up to the armed robbery. Detective Blunschi testified that on September 15, 2016, from 1:24 a.m. to 4:24 a.m. the cell phone that was found in the car traveled east along I-20 from Calhoun headed toward Motel 6. The cell phone originated at Minnifield Road, where Copeland lives, and last hit at Commercial Parkway, which is the road that runs beside I-20 where Motel 6 is located. Accordingly, we find that the evidence was sufficient to support a conviction for armed robbery, and thus this assignment of error is without merit.

*Sufficiency of Evidence – Stolen Firearm*

Copeland argues that the state failed to establish that he was in possession of the firearm in question, as all the evidence connecting him to the firearm is circumstantial. Copeland argues that this case is factually similar to *State v. Norman*, 434 So. 2d 1291 (La. App. 3 Cir. 1983), where the defendant was convicted of possession of marijuana based on marijuana found in a box along with a receipt with the defendant's name on it. The marijuana was found in a room that was purportedly being used by the defendant, but there was no direct evidence establishing that fact.

The appellate court reversed the conviction, finding that the state failed to exclude a number of reasonable hypotheses of defendant's innocence and that the circumstantial evidence presented did not prove the defendant had constructive possession of the marijuana. *See Norman, supra*. Copeland argues that in the instant case his driver's license was found in the vehicle, but the state failed to introduce evidence establishing that he had exclusive access to the vehicle. Neither Copeland's fingerprints nor his DNA were found on the firearm, thus he argues, the state did not carry its burden of excluding every reasonable hypothesis of innocence.

17

The state responds that the evidence presented was sufficient to establish that Copeland had dominion and control over the firearm stolen in the Cowboy Lane burglary, as said firearm was used during the armed robbery. The state further argues that in absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson, supra; State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So. 2d 219, *writ denied,* 06-1083 (La. 11/9/06), 941 So. 2d 35.

The state argues that Ms. Walton testified that the robber was armed with a dangerous weapon and identified the .22 HP228 pistol, recovered from the white Ford Expedition, as the one held to her body throughout the robbery. Additionally, the firearm was recovered from the white Ford Expedition, which contained Copeland's identification card, clothing items that matched those of the robber, and contained his DNA. The state further argues that other items stolen from the Cowboy Lane address were found at Copeland's home and in the back of the white Ford Expedition; in addition, Copeland sold a Nintendo DS system and game to GameStop in West Monroe, which were also stolen from the Cowboy Lane address. As there are numerous pieces of physical evidence that connect Copeland with the firearm, the state asserts that the instant case is distinguishable from *State v. Norman, supra*.

La. R.S. 14:69.1 states, in part:

A. (1) Illegal possession of stolen firearms is the intentional possessing, procuring, receiving, or concealing of a firearm which has been the subject of any form of misappropriation.

18

(2) It shall be an affirmative defense to a prosecution for a violation of this Section that the offender had no knowledge that the firearm was the subject of any form of misappropriation.

In this case, the jury found that Copeland was in possession of a stolen firearm based on the evidence presented. The firearm was located in the white Ford Expedition that contained not only Copeland's driver's license, but also the cash drawer and money taken during the robbery of Motel 6, a cell phone that traveled from Copeland's home to the parking lot near the location of the robbery, and clothing that matched those of the robber and contained the DNA of Copeland. In addition, the gun was determined to have been stolen during a burglary at a Cowboy Lane address and additional items from that burglary were found in the white Ford Expedition, and in Copeland's home.

Copeland has not attempted to offer a plausible explanation for how the stolen gun appeared in the white Ford Expedition, along with other stolen items or how stolen items from the same burglary were found in his home. The state is not required to exclude every hypothesis of innocence, just those that are reasonable. Copeland has failed to identify any reasonable hypothesis of innocence left unaddressed by the state. Therefore, we find that a rational jury, when viewing the facts in the light most favorable to the prosecution, could have found Copeland guilty of this crime beyond a reasonable doubt. This assignment is therefore without merit.

*Ineffective Assistance of Counsel*

Copeland argues that his trial counsel was ineffective in four ways that had a prejudicial effect on him: (1) his trial counsel disclosed confidential communication; (2) trial counsel wrongly stipulated to

19

admission of other crimes evidence; (3) trial counsel failed to request that the jury be polled; and (4) trial counsel failed to file a motion to suppress evidence.

*Disclosure of confidential communications*

Copeland cites the Louisiana Rules of Professional Conduct Rule 1.6, which states, in pertinent part that "a lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent…" and Rule 1.8, which states, in part, "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules" to support his argument that trial counsel disclosed various privileged communications on the record to the court and the state.

Copeland argues that prior to the start of the evidentiary portion of his trial, seemingly to vent his frustrations, trial counsel complained of his client's refusal to take two previously tendered plea deals. Copeland further alleges that trial counsel divulged privileged attorney client communications and made argument to the court implicating his client's guilt:

> DEFENSE COUNSEL: Now. There is another issue. Mr. Copeland has said to me that he's not the only suspect in this case. I said, well, who else is there. His response is you'll find out during testimony. I said well help me out. Clue me in on this. Who is it? He won't tell me. There is another person whose ID was found. A Demartavis Cortez Baker. But if you recall the lady testified she was 5 foot four or 5 foot five and the person was a couple inches taller than her. I pulled every arrest report Mr. Baker has ever had, which are considerable and he's 6 foot three. So he is we did look at that but we didn't consider and I shared that with Mr. Copeland. He still says he's not the only suspect but he want [*sic*] clue me into who it is…
>
> DEFENSE COUNSEL: Yes sir. I again asked Mr. Copeland would he identify any of the suspects to me. His response to me was you can read the discovery. There are some other cases that involve a burglary that is on the trial docket today, and I

believe he's referring to people involved in that. But he's never mentioned that to me before today. Therefore, I haven't had a chance to have an investigator look into it.

THE COURT: Into the burglary? Another case? Is that what you're referring to?

DEFENSE COUNSEL: There are two; I believe two counts, Ms. Thompson?

THE STATE: Yes.

DEFENSE COUNSEL: Uh and there may be testimony from them in regards to the stolen property. But as some say in this is the first time we get to Court, he's telling me he's not the only suspect. He's known this for a while and he could have told me if that's what he believes. And I could have had an investigator check on it. I get information today, too late to have an investigator check on it.

***

Copeland argues that this disclosure was completely inappropriate and to his disadvantage. Copeland further argues that he was forced to proceed to trial with an attorney who not only demonstrated a disbelief in his innocence, but who repeatedly demonstrated that he would disclose privileged communication about his case to the trial court and the state, a breakdown in the base level trust required in an attorney-client relationship. Copeland asserts that his trial counsel was not acting in his best interest, thus depriving him of the effective assistance of counsel at a critical stage of the proceedings. According to Copeland, this was a breakdown in the adversarial process, requiring a reversal of his conviction and sentence.

The state responds that the statements by defense counsel and asserted by Copeland to be confidential communications are taken out of context. Trial counsel was merely putting on the record the plea offer extended by the state so that Copeland could not in the future assert he was unaware of any plea offer and/or he was under the mistaken belief the offer was different.

21

Additionally, the state alleges that nothing heard in court provided any insight to any possible defenses and the one name provided by defense counsel was provided in the state's discovery answer.

*Stipulation to other crimes evidence*

Copeland argues that ordinarily, upon the receipt of the state's *Prieur,* notice, defense counsel files an opposition to the introduction of such evidence, as to the admissibility of other acts of misconduct that involve substantial risk of grave prejudice to a defendant. *State v. Prieur*, 277 So. 2d 126 (La. 1973). In the instant case, trial counsel failed to object to the evidence, but instead wrongly stipulated to the admissions of other crimes evidence, stating:

> "[F]or purposes of guilty knowledge, identity, and absence of mistake of fact. Law enforcement can discuss burglary investigation resulting in illegal possession of stolen things charged on the bill of information at 161 Cowboy Lane, Calhoun. State will not discuss the Colley Road burglary."

Copeland further argues that by stipulating to the admissibility of other crimes evidence, counsel denied him the opportunity to have the trial court determine the independent relevancy of the evidence and balance its probative value against its prejudicial effect. As there was no dispute that the white Ford Expedition was connected to Copeland, the only possible purpose for admitting this prior crime evidence would be to establish that Copeland had knowledge that the firearm was stolen. Copeland argues that knowledge is not an element of the crime charged and that admission of this evidence was irrelevant to the instant crime, highly prejudicial, and even implied that he committed the other burglary.

The state responds that the record does not support Copeland's allegations. The state argues that on September 1, 2017, the state filed a

22

notice of its intent to admit other crimes evidence. The matter was set for hearing on September 7, 2017. There was no dispute that items from the Cowboy Lane burglary were found at Copeland's home and in his vehicle. The state further asserts it could be argued that notice was not truly necessary, as the facts of the burglary at Cowboy Lane and the items recovered were an integral part of the act or transaction that is the subject of this proceeding, i.e., the gun used in the robbery was stolen in the Cowboy Lane burglary. Finally, the state argues that it is within defense counsel's purview and reasonable judgment not to oppose this evidence and agree to the stipulation.

*Failure to Poll Jury*

Copeland argues that for an attorney practicing criminal defense to decline to have a jury polled is objectively unreasonable, especially in light of the recent movement toward unanimous verdicts. Copeland argues that he is prejudiced by not knowing whether his verdict was by a non-unanimous jury, as the Supreme Court recently granted a writ to determine the constitutionality of nonunanimous jury verdicts under the Federal Constitution. Should the Supreme Court determine that nonunanimous jury verdicts are unconstitutional, he has been denied the opportunity to attack his verdict.

Additionally, due to his indigent status, Copeland argues that he is unable to hire an attorney to conduct an investigation, post-conviction, to determine if his jury was nonunanimous, and even if he could, there is no guarantee that he could establish the vote count of the jury. As such, Copeland argues that his conviction should be reversed and the case remanded to the trial court for a new trial.

23

The state responds that this is not a proper argument for ineffective assistance of counsel and given the remote possibility that the United States Supreme Court ignores the doctrine of *stare decisis* and applies any ruling on nonunanimous verdicts retroactively, then Copeland has the remedy of post-conviction relief application.

*Failure to file a motion to suppress evidence*

Copeland argues that the state's evidence at trial stems almost entirely from evidence found inside the vehicle, which was illegally seized without a warrant. As warrantless searches are *per se* unreasonable, *Coolidge vs. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), *State v. Guzman*, 362 So. 2d 744 (La. 1978), the state has the burden of proving that the search falls within one of the few delineated exceptions to the warrant requirement. Copeland argues that the only possible exception is the "automobile emergency exception" as outlined in *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925).

The automobile emergency exception requires that there be probable cause to believe that the vehicle contains contraband or evidence of a crime; and an exigent circumstance that requires an immediate warrantless search, i.e., the impracticability of obtaining a warrant due to the possibility that the car could be moved either by its occupants, if not arrested, or by someone else. Copeland argues that the instant case lacks exigency, making the warrantless seizure of the vehicle clearly unlawful. Moreover, Copeland further argues that the vehicle was parked in a parking lot with no one else around, so there was no reason the police could not have waited to get a warrant to seize and search the vehicle.

Copeland contends that had trial counsel filed a simple motion, the state would have been required to establish some lawful exception to warrant requirement, which they would not have been able to do. Copeland argues that had the vehicle's seizure been found to be unlawful and the evidence therein suppressed, the state would have been left with only the surveillance video and two eyewitnesses who could not identify Copeland as the perpetrator, thus the charges would have had to be dismissed. Additionally, Copeland argues that the police ultimately felt that several days later they needed to apply for a search warrant for the vehicle, under circumstances that are not clear from the record.

Under *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the subsequent actions by the police vitiate any claim they may have had to good faith. A motion to suppress under these circumstances would very likely have prevailed and Copeland argues that his trial counsel's failure to file and defend a motion to suppress fell below the standard of practice, which prejudiced him.

The state responds that a warrantless search conducted pursuant to valid consent is permitted. *See State v. Raheem*, 464 So. 2d 293 (La. 1985); *State v. Crews*, 28,153 (La. App. 2 Cir. 5/8/96), 674 So. 2d 1082. The state argues that Copeland gave consent for the search by signing a "Permission for Search and Seizure" and that he was present throughout the entire search. The state further argues that upon defense counsel's learning of the proper consent to the search of the vehicle and viewing the waiver signed by

Copeland, defense counsel's determination that a motion to suppress would be fruitless was a sound decision.[7]

A claim of ineffective assistance of counsel is most appropriately addressed through an application for post-conviction relief rather than direct appeal, to afford the parties an evidentiary hearing before the trial court and create an adequate record for review. *State v. Truitt,* 500 So. 2d 355 (La. 1987); *State v. Brown,* 384 So. 2d 983 (La. 1980). *See also State v. Lee,* 26,542 (La. App. 2 Cir. 5/12/94), 636 So. 2d 634. However, where the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal, it may be addressed in the interest of judicial economy. *State v. Peart,* 621 So. 2d 780 (La. 1993).

A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. In assessing a claim of ineffective assistance of counsel, a two-pronged test is employed. The defendant must show that (1) his counsel's performance was deficient, and (2) the deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Soler,* 93–1042 (La. App. 5 Cir. 4/26/94), 636 So. 2d 1069, 1075, *writs denied*, 94–0475 (La. 4/4/94), 637 So. 2d 450, and 94–1361 (La. 11/4/94), 644 So. 2d 1055. The error is prejudicial if it was so serious as to deprive the defendant of a fair trial, or "a trial whose

---

[7] The state presented additional information in support of its argument that defense counsel was not ineffective for failing to file a motion for suppress; however, the evidence was not presented to the jury. The following information was presented at the preliminary examination: On the same morning of the armed robbery, Copeland called the Ouachita Parish Sheriff's Department at about 8:00 a.m. from a convenience store on the outskirts of town on Highway 34 to report that earlier he had been carjacked and three black robbers stole his 1986 Ford Expedition. Copeland stated that he was taken to the south end of Ouachita Parish and dropped off in a ditch. Copeland reported he walked back to town and called police to report the incident. After advising Copeland of his rights per *Miranda* and him signing an "Advice of Rights" waiver, Copeland explained that as he was walking back he passed two separate convenience stores "as he didn't feel good about them" before ultimately calling the police. Copeland explained that he probably would not show up on any store surveillance video, as he took shortcuts.

result is reliable." *Strickland v. Washington, supra*; *State v. Serio,* 94-131 (La. App. 5 Cir. 6/30/94), 641 So. 2d 604, 607, *writ denied,* 94-2025 (La. 12/16/94), 648 So. 2d 388, *recon. denied*, 94–2025 (La. 3/17/95), 651 So. 2d 261.

In order to prevail on a claim for ineffective assistance, a defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland v. Washington, supra*; *State v. Lee*, 26,542 (La. App. 2 Cir. 5/12/94), 636 So. 2d 634.

In the matter *sub judice*, in order to show that his trial counsel was ineffective, Copeland must show that his counsel's performance was deficient and that the deficiency prejudiced him. Copeland maintains he was denied effective assistance of counsel because his trial counsel disclosed confidential communication; wrongly stipulated to admission of other crimes evidence; failed to request that the jury be polled; and failed to file a motion to suppress evidence. We disagree.

Here, the statements of which Copeland complains are simply restatements on the record of previous plea offers extended to Copeland which were rejected, and notice to the court of Copeland's lack of assistance with his defense. Copeland has failed to show how these statements were in any way deficient performance or that counsel's statements prejudiced him. Thus, Copeland's argument that his trial counsel disclosed confidential communication is without merit.

A review of the stipulation shows that trial counsel limited the information to Copeland being in possession of other items from the Cowboy Lane burglary, along with the gun, in an effort to show that

27

Copeland had knowledge that the gun was stolen. This stipulation was an effective trial tactic that limited the potential for damaging testimony about any other charges that Copeland was facing. Thus, we find Copeland's argument that the stipulation to other crimes evidence was a deficiency resulting in prejudice to him is therefore without merit.

Furthermore, we find that Copeland's complaint regarding his trial counsel's failure to poll the jury fails to rise to the level of ineffective assistance of counsel as set forth in *Strickland v. Washington, supra.* Our law does not require jury polling in criminal cases, although it allows both the defense and the state to request that the jury be polled. La. C.CR.P. art. 812. The Louisiana Constitution was recently amended and now requires an unanimous verdict of 12 persons for cases resulting in a hard labor sentence, where the crime was committed on or after January 1, 2019. If the offense was committed prior to January 1, 2019, and the punishment is hard labor, 10 out of 12 jurors must concur to render a verdict. La. Const. Ann. art. I, §17; La. C.Cr.P. art. 782. Copeland's offense was committed on September 15, 2016, well before January 2019, so the unanimous jury verdict law does not apply.

Further, the jury was properly instructed that at least 10 members must agree on the verdict. The trial court made the following statements in its instructions to the jury, "The law requires that at least 10 of you must agree on the same verdict on each count[.] When at least 10 of you have agreed on the same verdict on each count, your foreperson shall circle that verdict[.]" Although trial counsel did not specifically ask to poll the jury, the trial judge verified the jury's verdict through the following exchange:

28

THE COURT: Ladies and Gentlemen of the jury, is this your verdict?
THE JURY: Yes.

\*\*\*

Based on the trial transcript, the jury unanimously confirmed that the verdict was correct. The trial court also asked trial counsel if there was a request for polling, and both counsel for the state and defense answered no. Thus, based on our review of the record, there is no indication in the record that the jury's verdict was improper. Moreover, Copeland has failed to show that his attorney was ineffective in his failure to have the jury polled.

Lastly, Copeland argues that his counsel was ineffective because he failed to file a motion to suppress. In this case, the search of the vehicle was **initially done in Copeland's presence with his consent** and following his arrest, was done pursuant to a valid warrant. As such, Copeland's claim of ineffective assistance of counsel is without merit.

*Jury Improperly Instructed*

By his fourth and final assignment of error, Copeland argues that the jury was improperly instructed as to the law of illegal possession of a stolen firearm. He argues that in 2014, the legislature redefined the crime of illegal possession of a stolen firearm, creating only two elements the state had to prove beyond a reasonable doubt: (1) that the defendant intentionally possessed the firearm; and (2) that the firearm was the subject of any form of misappropriation. Copeland argues that the removal of the criminal knowledge element created an affirmative defense, and the trial court erred in its instructions to the jury by stating that the offense contained three elements.

The jury instructions read, in pertinent part:

29

Thus, in order to find the defendant guilty of Illegal Possession of a Stolen Firearm, you must find:

(1) That the defendant intentionally did possess, procure, receive or conceal a firearm, namely, a .22 caliber pistol; and

(2) That the .22 caliber pistol had been taken or misappropriated during a robbery or theft; and

(3) That the defendant knew or had good reason to believe when he possessed, procured, concealed, or received the .22 caliber pistol that the firearm had been stolen.

Therefore, Copeland argues, if the statute is read as having three elements, then it contains two fatal flaws, both on the face of the statute. First, the statute would contain an element of criminal intent, which is not written in the text of the statute, and would fail due process requirements that a defendant have adequate notice of his crime. Second, the statute would contain an unconstitutional shifting of the burden onto the defendant.

Copeland maintains that this third element, which was removed by the legislature, was the defendant's knowledge that the firearm was misappropriated. Copeland further argues that had the parties not included the element of criminal knowledge, the testimony of Detective Cole, regarding an unrelated burglary, would not have been placed before the jury.

The state responds that criminal intent is an element of the crime. The state must prove that Copeland intentionally possessed the firearm, not that he just came to have the firearm through some accidental or negligent act. The state argues that the bill of information places Copeland on notice for the crime with which he was charged, even notifying him of the exact type of misappropriation. Therefore, the state argues, Copeland has suffered no infringement upon his due process rights.

Moreover, the state further argues that showing that the firearm was not only the subject of a misappropriation, but also that Copeland had knowledge of the circumstances of that misappropriation, does not shift any burden to the defendant to prove that he did not know that the gun was stolen. The state argues that it is required to show that the firearm is a subject of a misappropriation, and if anything, the state obligated itself to prove a more difficult fact that the misappropriation was the result of a theft or robbery of which Copeland was aware.

The state's final argument is that the issue of the "third element" did not come about until after the state presented its evidence to the jury. The evidence of the Cowboy Lane burglary was put forth for identity of the defendant, knowledge, and absence of mistake. The items found in the white Ford Expedition and at his home were items stolen from the Cowboy Lane address. This was used by officers to explain that Copeland's driver's license was found in the car, the DNA match of the clothing to Copeland, and the gun found in the vehicle was the same gun stolen from Cowboy Lane.

Generally, a party may not assign as error a complaint to a jury charge in the absence of a contemporaneous objection. *State v. Belgard*, 410 So. 2d 720 (La. 1982); *State v. Wilson*, 28,403 (La. App. 2 Cir. 8/21/96), 679 So. 2d 963. A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. La. C. Cr. P. art. 801(C).

It is well established that a defendant is limited to the grounds for objection articulated at trial and a new basis for an objection may not be

raised for the first time on appeal. *State v. Mathis*, 52,500 (La. App. 2 Cir. 1/16/19), 263 So. 3d 613, 623–24; *State v. Colby*, 51,907 (La. App. 2 Cir. 5/30/18), 244 So. 3d 1260; *State v. Holder*, 50,171 (La. App. 2 Cir. 12/9/15), 181 So. 3d 918, *writs denied*, 16-0092 (La. 12/16/16), 211 So. 3d 1166, 16-0056 (La. 12/16/16), 212 So. 3d 1176.

Errors in jury instructions are subject to the harmless error analysis. *State v. Mosley*, 51,168 (La. App. 2 Cir. 6/21/17), 223 So. 3d 158. The harmless error analysis evaluates whether the guilty verdict actually rendered in the trial was surely unattributable to the error. *State v. Chisolm*, 49,043 (La. App. 2 Cir. 5/14/14), 139 So. 3d 1091, *writ denied*, 14-1203 (La. 3/13/15), 176 So. 3d 1031.

A jurisprudential exception to the contemporaneous objection rule exists in cases where there have been fundamentally erroneous misstatements of the essential elements of the charged offense. In such cases, the Louisiana Supreme Court has adopted the view that such fundamentally incorrect jury instructions so affect the fairness of the proceedings and the accuracy of the fact-finding process that due process of law requires reversal, even in the absence of compliance with legislative procedural mandates. "Such an error is of such importance and significance as to violate fundamental requirements of due process." *State v. Williamson*, 389 So. 2d 1328 (La. 1980); *State v. Mathis, supra*. The exceptions to the Article 801 objection requirement exist in situations "where the error causes such a fundamental defect in the proceedings that the defendant is deprived of a fair trial." *Id.*

A jury charge must be considered as a whole, and particular phrases in a charge must be construed in the context of the entire charge. A conviction

32

will not be reversed on the ground of an erroneous charge unless the disputed portion, viewed with the remainder of the charge, is erroneous and prejudicial. *State v. Mitchell, supra.*

The pre-2014 version of Louisiana Revised Statutes 14:69.1 provides, in part:

> A. Illegal possession of stolen firearms is the intentional possessing, procuring, receiving, or concealing of a firearm which has been the subject of any robbery or theft under circumstances which indicate that the offender knew or should have known that the firearm was the subject of a robbery or theft.

The post-2014 and current version of La. R.S. 14:69.1 provides, in part:

> A. 1. Illegal possession of stolen firearms is the intentional possessing, procuring, receiving, or concealing of a firearm which has been the subject of any form of misappropriation.
>
> 2. It shall be an affirmative defense to a prosecution for a violation of this Section that the offender had no knowledge that the firearm was the subject of any form of misappropriation.

In *State v. Harris*, 2018-800 (La. App. 3 Cir. 6/5/19), 274 So. 3d 178, *citing*, *State v. Johnson*, 2009-862, (La. App. 3 Cir. 2/3/10), 28 So. 3d 1263, the Third Circuit held that, "Based on [La. R.S. 14:69.1], the State had to prove that the defendant intentionally possessed a firearm, that the firearm was the subject of robbery or theft, and that he knew or should have known the firearm was the subject of a robbery or theft." In the absence of a qualifying statutory provision, the terms "intent" and "intentional" in criminal statutes have reference to general criminal intent. La. R.S. 14:11; *State v. Godeaux*, 378 So. 2d 941 (La. 1980).

General intent exists when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to

the prescribed criminal consequences as reasonably certain to result from his acts or failure to act. La. R.S. 14:10. In a general criminal intent crime, the very doing of the acts, which have been declared criminal, shows criminal intent, which is necessary to sustain a conviction. *State v. Holmes*, 388 So. 2d 722 (La. 1980).

Here, because there was no contemporaneous objection to the alleged error in charging the jury, the issue has not been preserved for review. However, it is clear that the jury instructions as given, were based on the pre-revision version of La. R.S. 14:69.1, which then contained three elements.

In this case, we find that Copeland is correct in his argument that the state did not have to show that Copeland had knowledge that the firearm was the subject of a theft/misappropriation. As the revised version of the statute states, the state only has to prove the defendant's knowledge when the defendant asserts the affirmative defense that he had no knowledge of the misappropriation, **which Copeland did not do**.

However, we also find that the additional element that both parties agreed to **does not prejudice Copeland in any way**. In fact, as the state correctly argues, it actually burdens the state with an additional element to prove beyond a reasonable doubt. Without this element, the state still proved the necessary elements of the charge of illegal possession of a stolen firearm, beyond a reasonable doubt. Thus, we find that any error in this instruction did not offend Copeland's due process rights as set forth in *Williamson, supra*; and therefore, this assignment of error lacks merit.

## CONCLUSION

For the aforementioned reasons, Arijoray Lavon Copeland's convictions and sentences are affirmed.

**AFFIRMED.**